UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


JAMES BAKER,

        Plaintiff,

                                CASE NO. 13-CV-13657

v.

                                HON. MARK A. GOLDSMITH

NICOLAS SMISCIK, et al.,

        Defendants.

_____/


**OPINION AND ORDER**
**GRANTING IN PART AND DENYING IN PART**
**DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADINGS (Dkt. 16)**

## I.  INTRODUCTION

In this civil rights case, Plaintiff James Baker alleges that, during an encounter with police officers employed by the City of Southfield, Michigan, his rights under the Second and Fourth Amendments to the U.S. Constitution and under state law were violated.   The matter before the Court is a motion for judgment on the pleadings filed by all Defendants — Officers Nicolas Smiscik, Nick Cazan, Paul Hart, and Devlin Williams, Sergeant Tim Barr, Police Chief Eric Hawkins, the City of Southfield, and the Southfield Police Department.   The motion is fully briefed, and oral argument was heard on February 20, 2014.   For the reasons that follow, the Court will grant in part and deny in part Defendants' motion and dismiss the complaint.

## II.   BACKGROUND[1]

On April 11, 2013, Plaintiff James Baker entered a Dunkin Donuts shop in Southfield, Michigan to have a cup of coffee and a donut, while openly carrying a pistol, a rifle, a copy of the U.S. Constitution, and a "recording device."   Compl. ¶¶ 19, 22, 30, 37 (Dkt. 1).   Approximately fifteen minutes after his purchase, Plaintiff was approached by a group of police officers, who had been summoned to the shop as a result of a 911 call for help.   Id. ¶¶ 21, 32; Answer ¶ 21 (Dkt. 13).   As Plaintiff concedes, "the manager on duty called 911 and requested help in asking Plaintiff to leave."   Pl. Resp. at 8 (Dkt. 19) (citing Answer ¶ 21).   Upon the officers' approach, Plaintiff activated his recording device. Compl. ¶ 22.   In approaching Plaintiff, an unidentified officer had his weapon drawn.   Id. ¶ 23.

One officer, Paul Hart, questioned Plaintiff as to why he had the firearms, and Plaintiff replied that he "open carries" them.   Id. ¶ 24.   Officer Hart next ordered Plaintiff to place his hands on his head, and he removed the rifle and pistol from Plaintiff.   Id. ¶ 25.   Officer Hart then asked for identification, which Plaintiff declined to present.   Id. ¶¶ 26-27.   Officer Hart took Plaintiff's wallet from Plaintiff's jacket, but Plaintiff stated that he did not consent to a search of his person.   Id. ¶¶ 28-29.

Officer Hart, along with other officers — Smiscik, Williams, Cazan, and Sergeant Barr — then restricted Plaintiff's movement inside the restaurant.   Id. ¶ 33.   Plaintiff objected to his "confinement."   Id. ¶ 34.   Within less than three minutes of arriving at the Dunkin Donuts, one of the officers stated that Plaintiff was not violating any law by openly carrying his firearms.   Id. ¶ 36.   Plaintiff indicated that he would leave the area, and would have left the area if he was not

---

[1] The facts are taken from the pleadings and facts that Plaintiff admits.   Stafford v. Jewelers Mut. Ins. Co., 554 F. App'x 360, 369-370 (6th Cir. 2014).

wanted there.   Id. ¶ 39.

Approximately thirteen minutes and twenty seconds into the encounter with the Southfield police, Plaintiff attempted to return his copy of the Constitution to his person, and one of the officers "force[d] his hand under Plaintiff and state[d] 'Now, you are touching me.   Now, you are touching me' and 'next time I'm going to take action.'"   Id. ¶ 30.

After the officers lectured Plaintiff about openly carrying his pistol and rifle, the officers had the Dunkin Donuts manager ask Plaintiff to leave the shop and not return.   Id. ¶ 37.   After the request was made by the manager, the officers escorted Plaintiff out of the establishment and placed his rifle and pistol in the trunk of his vehicle; the officers then watched Plaintiff leave the premises.   Id. ¶¶ 37-40.   The entire encounter lasted approximately 30 minutes.   Id. ¶¶ 36, 38.

Plaintiff filed suit in August 2013, alleging (i) assault and battery; (ii) violations of the Second and Fourth Amendments of the U.S. Constitution, violation of the Michigan Constitution, false imprisonment, and gross negligence; (iii) violations of 42 U.S.C. § 1983 and § 1988; (iv) violations of the Fourth and Fourteenth Amendments to the U.S. Constitution, and (v) violation of 42 U.S.C. § 1985 (civil conspiracy).   Compl. ¶¶ 20-69.   Plaintiff sued the individuals in their official and personal capacities.

Defendants moved for judgment on the pleadings under Federal Rule of Civil Procedure 12(c).   In his response brief, Plaintiff withdrew some claims and abandoned others.   Plaintiff explicitly withdrew his (i) federal claims against the individual officers in their official capacities, (ii) claim of gross negligence, (iii) state constitutional claims in Count II (unlawful seizure), and (iv) all claims against the Southfield Police Department.   See Pl. Br. at 4, 12, 14 (Dkt. 19).   Furthermore, Plaintiff did not respond to Defendants' arguments concerning (i) due process, (ii) equal protection, and (iii) civil conspiracy.   At oral argument, Plaintiff, through counsel,

confirmed the withdrawal and abandonment of these claims.

Therefore, remaining for consideration are the following claims:

Count I (against Officers Cazan, Hart, Smiscik, and Williams, and Sergeant Barr in their personal capacities): Assault and battery.

Count II (against Officers Cazan, Hart, Smiscik, and Williams, and Sergeant Barr in their personal capacities): Violations of the Second and Fourth Amendments of the U.S. Constitution and false imprisonment.

Count III (against Officers Cazan, Hart, Smiscik, and Williams, Sergeant Barr, and Chief Hawkins in their personal capacities, and the City of Southfield): Violations of 42 U.S.C. §§ 1983, 1988.

Count IV (against Officers Cazan, Hart, Smiscik, and Williams, Sergeant Barr, and Chief Hawkins in their personal capacities, and the City of Southfield): Violations of the Fourth Amendment to the U.S. Constitution.

## III.   STANDARD OF DECISION

Defendants moved under Rule 12(c) for judgment on the pleadings.   Any party may move for the entry of a judgment after the pleadings are closed, but early enough not to delay trial.   Fed. R. Civ. P. 12(c).   Courts apply the same analysis to motions for a judgment on the pleadings under Rule 12(c) as is applied to applications for dismissal under Federal Rule of Civil Procedure 12(b)(6).   Warrior Sports, Inc. v. Nat'l Collegiate Athletic Ass'n, 623 F.3d 281, 284 (6th Cir. 2010).   "For purposes of a motion for judgment on the pleadings, all well-pleaded material allegations of the pleadings of the opposing party must be taken as true, and the motion may be granted only if the moving party is nevertheless clearly entitled to judgment."   JPMorgan Chase Bank, N.A. v. Winget, 510 F.3d 577, 581 (6th Cir. 2007).   However, a court need not accept as true legal conclusions or unwarranted factual inferences.   Id. at 581-582.

When evaluating a motion for a judgment on the pleadings, a court considers the complaint, the answer, and any written instrument attached as exhibits.   Fed. R. Civ. P. 12(c).   A

4

court should also consider any undisputed facts.   Stafford v. Jewelers Mut. Ins. Co., 554 F. App'x 360, 369-370 (6th Cir. 2014) (taking judicial notice of undisputed facts in documents considered by district court on ruling on 12(c) motion); see also Knutson v. City of Fargo, 600 F.3d 992, 999-1000 (8th Cir. 2010) (holding, on review of 12(c) dismissal, that district court could take judicial notice of a publicly available state-court argument, which involved a concession by the appellant).

## IV.   ANALYSIS

### A.  The Federal Constitutional Claims[2]

#### 1.   The Claims Against the Individual Defendants

In their opening brief, Defendants argue that the personal capacity claims against the officers should be dismissed based on qualified immunity.   Defs. Br. at 5-13 (Dkt. 16).   This defense protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."   Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).   Once a defendant raises a qualified-immunity defense, courts are to conduct a two-pronged inquiry: (i) whether the facts alleged show the defendant's conduct violated a constitutional right, and (ii) whether that right was "clearly established" at the time of the alleged violation.   Pearson v. Callahan, 555 U.S. 223, 232 (2009).   A district court has discretion to determine the sequence in which to address the two

---

[2] A few points of clarification are needed regarding Plaintiff's repetitive complaint.   Counts II, III, and IV are duplicative, as they all assert violations of the Fourth Amendment from the same alleged conduct.   In analyzing Plaintiff's claims, the Court's rulings apply to each of these counts. Furthermore, Count III alleges that "Defendants violated 42 U.S.C. § 1983."   Compl. ¶ 57. However, section 1983 "does not itself create any constitutional rights; it creates a right of action for the vindication of constitutional guarantees found elsewhere."   Braley v. City of Pontiac, 906 F.2d 220, 223 (6th Cir. 1990).   Therefore, in analyzing Plaintiff's claim, the Court looks "elsewhere" — to the Fourth and Second Amendments, as referenced in the complaint.   See, e.g., Compl. ¶¶ 47, 52, 55-56.

prongs of qualified immunity.   Grawey v. Drury, 567 F.3d 302, 309 (6th Cir. 2009).

Qualified immunity turns on the "objective legal reasonableness" of the officers' actions in light of legal rules established at the time of their action.   Harlow, 457 U.S. at 819.   If state actors of "reasonable competence" could disagree on whether a right existed, "immunity should be recognized."   McCloud v. Testa, 97 F.3d 1536, 1553 (6th Cir. 1996).   Therefore, government officials are not personally liable if they act under an objectively reasonable belief that their actions are lawful.   Ahlers v. Schebil, 188 F.3d 365, 372-373 (6th Cir. 1999).

In assessing the immunity defense relative to Plaintiff's federal constitutional claims, the Court analyzes the Fourth Amendment and Second Amendment claims, in turn.

### a.  The Fourth Amendment Claim

### i.  Search and Seizure Standards[3]

The Fourth Amendment (applicable to state actors through the Fourteenth Amendment) protects individuals against "unreasonable searches and seizures."   U.S. Const. amend. IV.   As the "ultimate touchstone of the Fourth Amendment is reasonableness," courts have recognized several situations where police officers can act without first obtaining a warrant for a search or a seizure.   Johnson v. City of Memphis, 617 F.3d 864, 868 (6th Cir. 2010) (quotation marks omitted).

---

[3] The scope of an individual's Fourth Amendment rights is the same, whether asserted in the context of a motion to suppress evidence in a criminal case or to vindicate rights through a 1983 action.   See Zulock v. Shures, 441 F. App'x 294, 304 (6th Cir. 2010) ("Generally, where a state affords an opportunity for an accused to contest probable cause at a preliminary hearing and the accused does so, a finding of probable cause by the examining magistrate or state judge should foreclose relitigation of that finding in a subsequent § 1983 action."); United States v. Warshak, 532 F.3d 521, 528 (6th Cir. 2008) (noting that, in determining challenges to "the 'reasonableness' of searches under the Fourth Amendment," courts generally "review such challenges in two discrete, post-enforcement settings: (1) a motion to suppress in a criminal case or (2) a damages claim under § 1983") (emphasis deleted).

6

One well-recognized exception to the warrant requirement is the doctrine of "exigent circumstances." Id. (citing Mincey v. Arizona, 437 U.S. 385, 390 (1978) ("[W]arrants are generally required to search a person's home or his person unless the 'exigencies of the situation' make the needs of law enforcement so compelling that the warrantless search is objectively reasonable under the Fourth Amendment.")). "Exigent circumstances arise when an emergency situation demands immediate police action that excuses the need for a warrant." Id. Such circumstances include situations where there is "a risk of danger to the police or others" or a "need to assist persons who are seriously injured or threatened with such injury." Id.

Another exception to the warrant requirement is recognized for investigatory stops, when a law enforcement officer has "reasonable suspicion" of criminal activity based on "specific and articulable facts" known to the officer at the time of the stop. Embody v. Ward, 695 F.3d 577, 580 (6th Cir. 2012). Reasonable suspicion "is not readily, or even usefully, reduced to a neat set of legal rules[,]" and "is obviously less demanding than that for probable cause," which requires "a fair probability that contraband or evidence of a crime will be found." United States v. Sokolow, 490 U.S. 1, 7 (1989) (quotation marks omitted). "The length of the stop and the extent of intrusion must be reasonably related in scope to the circumstances which justified the interference." Embody, 695 F.3d at 580 (quotation marks omitted). Furthermore, officers must "diligently pursue means of investigation that are likely to confirm or dispel their suspicions quickly." Id. (brackets omitted).

Embody is an instructive case, as it concerned a park ranger's investigatory stop of an individual openly carrying an AK-47 assault rifle in a Tennessee state park. Id. at 580. The Sixth Circuit held that the investigating officer had reasonable suspicion to stop the individual based on the following facts: (i) the firearm's barrel was a half-inch shy of the legal definition for

7

a rifle (a firearm not expressly allowed under Tennessee's open-carry statute), (ii) the firearm had a thirty-round ammunition clip, (iii) the plaintiff was wearing camouflage, (iv) a couple reported the plaintiff to the officer, stating they saw a man carrying an "assault rifle," and (v) the tip of the barrel was painted orange, which may have been done to disguise an illegal weapon as a toy.   Id. at 580-581.   Based on these circumstances, the Sixth Circuit held that "an officer would reasonably suspect something was amiss," and that there was a "risk to officer (or public) safety," justifying detaining the plaintiff and seizing his weapon while the officers investigated.   Id.

Furthermore, the court concluded that the detention, which lasted two-and-a-half hours, was reasonable because the officers needed to determine whether (i) the AK-47 was a handgun (which is authorized under the open-carry statute), (ii) the plaintiff had a permit for the firearm, (iii) the plaintiff had illegally modified the firearm, and (iv) the plaintiff posed any safety threat. The court also concluded that the length of the detention was reasonable because the officers needed to respond to the plaintiff's request to speak to a police supervisor, even though he was told that it would delay his release.   Id.

### ii. The Parties' Arguments

Relying primarily on Embody, Defendants assert that no Fourth Amendment violation occurred because (i) Plaintiff's actions and the 911 call gave the officers reasonable suspicion to investigate him, and (ii) the officers' investigation was brief and limited, making Plaintiff's detention   reasonable.   Defs. Br. at 7-8, 10-13; Reply Brief at 2 (Dkt. 20).

In response, Plaintiff makes several points, but does not weave them all into coherent arguments.   He first provides an overview of the right to bear arms conferred by the Second Amendment and Michigan's "open carry" laws.   Pl. Br. at 6-7.   He next points out that, while Michigan law restricts where a person may openly carry a firearm, a Dunkin Donuts shop does not

8

qualify as one of the proscribed places under Michigan law.   Id. at 7.   Plaintiff also observes that the Dunkin Donuts manager did not ask Plaintiff to leave the establishment until after the officers had detained Plaintiff and Plaintiff had offered to leave.   Id. at 7-8.   Further, Plaintiff argues that the facts of Embody make that case inapposite to the instant case.   Id. at 8.   For instance, Plaintiff asserts that, under Michigan law, only handguns need to be licensed and registered, but not rifles, so there was no need for the officers to determine whether his rifle was licensed.   Id. at 8-9.   Finally, Plaintiff contends broadly that the officers "did not have reasonable suspicion or probable cause that a crime was afoot as one of the Defendants told Plaintiff that he was not violating any law by open carrying."[4]   Id. at 9 (citing Compl. ¶ 36).

### iii.   Discussion

The Court agrees with Defendants that the officers conducted themselves reasonably in responding to the 911 call and investigating Plaintiff at the Dunkin Donuts shop.   As the Sixth Circuit has held, exigent circumstances can arise "from the threat to the safety of the police officers and innocent bystanders" in an area.   O'Brien v. City of Grand Rapids, 23 F.3d 990, 997 (6th Cir. 1994).   Furthermore, police officers may consider 911 calls as evidence that an emergency may well exist:

> The whole point of the 911 system is to provide people in need of emergency assistance an expeditious way to request it.   Indeed, in many communities, the use of 911 for any purpose other than to report an emergency or to request emergency assistance is at least a misdemeanor offense.   See, e.g., . . . Mich. Comp. Laws Ann. § 750.411a (West 2004)

---

[4] Notably, Plaintiff does not claim that discovery is needed or that the record needs supplementation with respect to his federal claims.   Plaintiff does make a passing reference to an unknown officer who allegedly committed a battery upon Plaintiff, and that it would be improper for the Court to grant Defendants immunity under Michigan law until the identity of this officer is ascertained.   See Pl. Br. at 11.   As the Court declines supplemental jurisdiction over the state-law claims, this limited request for discovery is moot.

> (punishing any false reporting of crimes, including through the 911 system) . . . .   Because a 911 call is by its nature an appeal for help in an emergency, the emergency aid exception best fits the attitude of police responding to a 911 call under the circumstances present here.

Johnson, 617 F.3d at 870.

The flexibility of the exigent circumstances doctrine is illustrated by the facts of Johnson, where the court found no Fourth Amendment violation.  Id. at 869.  The potential need for emergency aid justified the warrantless entry into a home because (i) the home had an open door, (ii) no one responded to the officer's announcement of his presence, and (iii) the officer was aware of a 911 "hang call" from the home, i.e. a 911 caller hung up before speaking with the operator, and the operator was unsuccessful at reaching the caller upon calling back.   Id.

In the instant case, the officers' warrantless conduct is justified based on exigent circumstances.   Southfield police officers were dispatched to the Dunkin Donuts shop due to the shop manager's 911 call requesting assistance in asking Plaintiff to leave.   Upon entering the restaurant, the officers observed Plaintiff with a rifle and handgun, Compl. ¶¶ 21-24 — an indisputably unusual circumstance at a donut shop in a suburban setting.    The police were also faced with a display of firepower potential far in excess of any possible justification based on self-defense.   And their inquiry as to the reason for this firearm display was met with a vague answer that Plaintiff "openly carries" — hardly a reassuring one in light of the mix of potentially volatile circumstances.   Given "a risk of danger to the police or others[,]" and a "need to assist persons" who were possibly threatened with injury, Johnson 617 F.3d at 868, it was objectively reasonable for the officers to take the limited action that they did: disarm Plaintiff and detain him temporarily while they investigated whether he presented a risk to others, or   possibly to himself.

The Fourth Amendment's respect for individual privacy and its protection against unwarranted government intrusion have always been tempered by concerns for the safety of law enforcement officers and the public.   See United States v. Bishop, 338 F.3d 623, 625-626 (6th Cir. 2003) ("In delineating the contours of the Fourth Amendment's warrant and probable cause requirements for searches and seizures, the Supreme Court has recognized several exceptions that acknowledge the need for police officers to protect themselves and the public from violence in circumstances where it would not be practical to require the officer to secure a warrant and where probable cause may be lacking.") (citations omitted).   The "Constitution does not limit the government officers' rights to protect themselves from assault when their fear is reasonably based on objective facts."   Id. at 626-628 (upholding officer's seizure of pistol through open window of unattended automobile as reasonable "in light of the risk that unattended guns pose to public safety"); see also United States v. Fleming, No. 09-20573, 2010 WL 5129057, at *7 (E.D. Mich. Oct. 20, 2010) ("Police may seize a firearm in plain view if the firearm poses a danger because of its inherently dangerous nature even if its illegality is not readily apparent.").   These long-recognized concerns for the safety of police officers and the public have taken on even greater urgency by recurrent tragedies triggered by gun violence in public spaces.[5]   To prevent such tragedies, police are properly given sufficient freedom of action to investigate circumstances that reasonably suggest an immediate risk to officer or public safety.

---

[5] See, e.g., Aldofo Flores, "7 dead in drive-by shootings near UC Santa Barbara," L.A. Times, 5/24/14, available at www.latimes.com/local/lanow/la-me-ln-santa-barbara-deadly-shooting-20140524-story.html (last visited 9/9/14); Jennifer Brown, "12 shot dead, 58 wounded in Aurora movie theater during Batman premier," The Denver Post, 7/21/12, available at www.denverpost.com/news/ci_21124893/12-shot-dead-58-wounded-aurora-movie-theater (last visited 9/9/14); Dan Eggen and Jenna Johnson, "8 Are Slain, 5 Wounded by Gunman at Omaha Mall," The Washington Post, 12/6/07, available at www.washingtonpost.com/wp-dyn/content/article/2007/12/05/AR2007120501868.html (last visited 9/9/14).

Additionally, the officers had specific and articulable facts to support a reasonable suspicion of criminal activity to detain Plaintiff briefly and seize his firearms temporarily.   The unusual display of multiple firearms, coupled with a 911 call seeking assistance in removing Plaintiff from the premises, support a reasonable suspicion that Plaintiff might be engaged in a criminal trespass of the premises, see Mich. Comp. Laws § 750.552 (proscribing the trespass upon the premises of another), or endangering other customers.[6]

And Plaintiff's refusal to assist with the officers' investigation — by failing to identify himself or produce identification — only compounded the concern that Plaintiff may be engaged in a criminal activity.   See Hiibel v. Sixth Judicial District Court, 542 U.S. 177, 188 (2004) (stating that an identity request "has an immediate relation to the purpose, rationale, and practical demands of a Terry stop."); see also id. at 186 (explaining that obtaining a suspect's name in the course of an investigative stop "serves important government interests" by (i) informing "an officer that a suspect is wanted for another offense, or has a record of violence or mental disorder" or (ii) helping "clear a suspect and allow the police to concentrate their efforts elsewhere"); Combs v. City of Birmingham, No. 12-14528, 2013 WL 4670699, at *9 (E.D. Mich. Aug. 30 2013) ("demanding and obtaining certain identifying information from a suspect may be a critical and legitimate component to a Terry stop"); United States v. Motley, No. 2:13-cr-20373–SHL, 2014

---

[6] To justify a temporary detention, an officer need only have reasonable suspicion that "crime is afoot," i.e. criminal activity in general.   United States v. Pack, 612 F.3d 341, 356 (5th Cir. 2010) ("Requiring police to have particularized facts that support a finding that 'criminal activity may be afoot' is different from requiring the police to articulate particularized facts that support a finding that a particular specific crime is afoot."); see also United States v. Bonilla, 357 F. App'x 693, 703 (6th Cir. 2009) (Griffin, J., dissenting) ("It is well-settled that reasonable suspicion that 'criminal activity may be afoot' does not require suspicion of a specific crime, but rather criminal activity in general.").   Thus, even if the facts here did not support reasonable suspicion of the particular crime of criminal trespass, they did establish reasonable suspicion of a more general nature, such as a potential breach of the peace, which would warrant a limited, temporary detention and investigation.

WL 2740377, at *12 (W.D. Tenn. June 17, 2014) (stating that, while the defendant had the right not to answer questions whether he had a license for a firearm and whether he was in possession of a firearm during a <u>Terry</u> stop, the refusal to respond did not help dispel the investigating officer's "reasonable fear for his own or others' safety").[7]

Like the officers in <u>Embody</u>, the officers in the instant case had reasonable suspicion that "something was amiss." <u>Embody</u>, 695 F.3d at 581. Both cases involve the presence of firearms: in <u>Embody</u>, the plaintiff had an AK-47 with a thirty-round drum; here, Plaintiff had a rifle <u>and</u> a pistol. In both cases, third parties made reports to the police of unusual activity: in <u>Embody</u>, persons present in a state park alerted the authorities; here, the manager of a restaurant called 911 for help. Lastly, in both cases, the officers were directed to a particular location by those concerned third parties; in other words, these encounters were not random stops on a sidewalk or a street by a patrol officer. These similarities highlight the absence of any indicia of arbitrary police conduct, and confirm the reasonableness of the police response.

The officers' conduct during Plaintiff's detention also was reasonable. After the officers disarmed Plaintiff, they asked for his identification, which is both standard police practice and a request that raises no Fourth Amendment concern. <u>See</u> <u>Hiibel</u>, 542 U.S. at 185-186 ("In the ordinary course a police officer is free to ask a person for identification without implicating the

---

[7] As Plaintiff correctly points out, the officers ultimately concluded that he had not engaged in any violation of Michigan's firearms laws or committed any other criminal act. However, whether a detained suspect is later determined not to have violated the law does not bear on whether the detaining officer had a reasonable suspicion to justify detention while pursuing an investigation. <u>Embody</u>, 695 F.3d at 581 ("Having worked hard to appear suspicious in an armed-and-loaded visit to the park, Embody cannot cry foul after park rangers, to say nothing of passers-by, took the bait. The officers stopped him only as long as it took to investigate the legitimacy of the weapon and, at his insistence, bring the supervisor to the park. No Fourth Amendment violation occurred."); <u>see also</u> <u>Lee v. Hefner</u>, 136 F. App'x 807, 811-812 (6th Cir. 2005) (holding that an officer had reasonable suspicion to detain the plaintiff pursuant to his investigation, which later revealed that the plaintiff, a mentally disabled adult, had done nothing to violate the law).

Fourth Amendment. . . . Our decisions make clear that questions concerning a suspect's identity are a routine and accepted part of many Terry stops.").   The officers required time to confirm Plaintiff's identity and review Plaintiff's license for his handgun.   The officers also required time to confirm the manager's request that Plaintiff leave the premises so that the officers could escort Plaintiff out of the restaurant and place his firearms in the trunk of his car.   The total time was approximately one-half hour, far less than the two-and-a-half hour detention upheld in Embody.   Under the totality of the circumstances, "the length of the stop and the extent of [the] intrusion" were "reasonably related in scope to the circumstances which justified the interference." Embody, 695 F.3d at 580 (internal quotations omitted).

Even if Defendants' conduct violated Plaintiff's Fourth Amendment rights, Plaintiff did not have a "clearly established right" that was violated under this case's facts.   Police officers of "reasonable competence" could hardly disagree on whether the officers' conduct here — in disarming Plaintiff temporarily and briefly detaining him during their investigation — would have violated his rights; therefore "immunity should be recognized."   McCloud, 97 F.3d at 1553. Upon encountering an armed individual in a public restaurant in response to a 911 call, the officers had to act quickly, and their conduct "was exactly the type of police work the community would expect, and possibly even demand."   United States v. Porter, 288 F. Supp. 2d 716, 721 (W.D. Va. 2003) (finding no Fourth Amendment violation when officers responded to a home alarm system being triggered, found no resident at home, neighbors provided an unconvincing story about the alarm being triggered, and officers forcibly entered the home to ensure that no one needed assistance).   In fact, had the officers failed to disarm Plaintiff and he had started shooting, the police would have had a difficult time explaining their failure to neutralize the danger he posed.

14

Therefore, the Court grants Defendants' motion as regards Plaintiff's claims under the Fourth Amendment.[8]

### b.  The Second Amendment Claim

With respect to the Second Amendment claim, Defendants argue that there was no Second Amendment violation because the right to bear arms at a business establishment, such as a Dunkin Donuts shop, has not been clearly established.   Def. Br. at 13; Reply Br. at 2-3.

Plaintiff's response brief does not clearly lay out Plaintiff's theory as to the claimed violation of Plaintiff's Second Amendment rights or the existence of a "clearly established" right. Reading Plaintiff's brief broadly, however, including his citations to District of Columbia v. Heller, 554 U.S. 570 (2008), and Michigan's "open carry" laws, the Court understands Plaintiff as raising two arguments: (i) he had a clearly established Second Amendment right to openly carry firearms in a private business establishment, and (ii) Defendants' interaction with Plaintiff, in which Defendants temporarily disarmed Plaintiff, infringed Plaintiff's Second Amendment rights. Because Plaintiff's first argument is without merit, its rejection by the Court is sufficient to sustain Defendants' claim of immunity, making it unnecessary to reach the second argument.

The Sixth Circuit "has emphasized that to find a clearly established constitutional right, a district court must find binding precedent by the Supreme Court, its court of appeals or itself." Barrett v. Steubenville City Schs., 388 F.3d 967, 972 (6th Cir. 2004) (quotation marks omitted).

---

[8] The Court also agrees with Defendants that Plaintiff has failed to plead facts that give rise to an inference of any personal involvement of Chief Hawkins, the officers' supervisor who was not present at the scene.  Reply Br. at 3.  "Supervisory officials are not liable in their individual capacities unless they either encouraged the specific incident of misconduct or in some other way directly participated in it."   Heyerman v. Calhoun Cnty., 680 F.3d 642, 647 (6th Cir. 2012). "[A] plaintiff must show that the official at least implicitly authorized, approved, or knowingly acquiesced in the unconstitutional conduct of the offending officers."  Id.  Plaintiff's failure to plead any facts regarding Chief Hawkins provides another basis for granting the motion in Chief Hawkins's favor.

15

The parties have not directed the Court to any relevant decision establishing that there is a clearly established right to bear arms in a private-business establishment.   The closest the parties come to citing any relevant case is <u>Embody</u>, where the court noted that "[n]o court has held that the Second Amendment encompasses a right to bear arms within state parks."   <u>Embody</u>, 695 F.3d at 581.

Plaintiff fails to meet the clearly-established-right prong for the qualified immunity analysis.   Plaintiff cites the Second Amendment, <u>Heller</u>, and a few inapposite authorities.[9]   But <u>Heller</u> was limited to an individual's right to bear arms in his or her home.   <u>Heller</u>, 554 U.S. at 635 ("In sum, we hold that the District's ban on handgun possession in the home violates the Second Amendment, as does its prohibition against rendering any lawful firearm in the home operable for the purpose of immediate self-defense.").   As the <u>Embody</u> court noted, the right Plaintiff claims "may or may not exist, but the critical point for our purposes is that it has not been established — clearly or otherwise at this point."   <u>Embody</u>, 695 F.3d at 581.

Because no right as claimed by Plaintiff was clearly established at the time of his encounter with the officers, the Court grants Defendants' motion as regards Plaintiff's 1983 claim for a Second Amendment violation against the individual Defendants.

### 2.   Claims Against the City of Southfield

---

[9]  Aside from <u>Heller</u>, Plaintiff cites only two cases: <u>Hoven v. Walgreen Co.</u>, 1:11-CV-881, 2012 WL 6025790 (W.D. Mich. Dec. 4, 2012), and <u>People v. Williamson</u>, 166 N.W. 917 (Mich. 1918). Because neither case addresses the Second Amendment, they do not support Plaintiff's attempt to show that the right he asserts was "clearly established."   <u>Hoven</u>, an employment case, involved an issue of state law under Michigan's Concealed Pistol Licensing Act, Mich. Comp. Laws § 28.421 <u>et seq.</u>   In <u>Williamson</u>, the Michigan Supreme Court affirmed a criminal conviction of the defendant who carried a concealed revolver without a permit in violation of a Michigan statute.

Plaintiff also cites Mich. Comp. Laws § 750.234d and "Legal Update No. 86," apparently a document issued by the Michigan State Police.   Neither of these sources provides a basis for finding a clearly established constitutional right for purposes of qualified immunity.   <u>Barrett</u>, 388 F.3d at 972.

16

Defendants argue that the federal claims against the City of Southfield should be dismissed.   Defs. Br. at 23.   Defendants claim that the absence of any constitutional violations by any individual defendants vitiates the federal constitutional claims against the city on a theory of municipal liability.   Id.   In response, Plaintiff claims that, because the officers did violate his rights, the federal claims against the city should not be dismissed.   Pl. Br. at 13.   The Court rejects Plaintiff's argument and agrees with Defendants.

It is well-established that if a plaintiff does not suffer a constitutional violation, there can be no unconstitutional custom or policy that is "the moving force" behind an act upon which municipal liability can attach.   Heyerman, 680 F.3d at 648 ("Municipal liability only attaches where a custom, policy, or practice attributable to the municipality was the 'moving force' behind the violation of the plaintiff's constitutional rights."); see also City of Los Angeles v. Heller, 475 U.S. 796, 799 (1986) ("If a person has suffered no constitutional injury at the hands of the individual police officer, the fact that the departmental regulations might have authorized the use of constitutionally excessive force is quite beside the point.") (emphasis removed).

As discussed above, the Court concludes that Plaintiff did not suffer a constitutional violation of either his Second Amendment or Fourth Amendment rights.   Accordingly, the Court grants Defendants' motion with respect to the constitutional claims against the City of Southfield.

**B.  State Law Torts**

Having determined that Plaintiff's federal claims lack merit, the case does not retain a federal character.   Accordingly, pursuant to 28 U.S.C. § 1367, the Court declines to extend supplemental jurisdiction over Plaintiff's state law tort claims of assault, battery, and false imprisonment contained in Counts I and II, and dismisses them without prejudice.   Brown v. Cuyahoga Cnty., 517 F. App'x 431, 436 (6th Cir. 2013) ("28 U.S.C. § 1367 allows a district judge

17

to decline to exercise supplemental jurisdiction over state-law claims if the district court has dismissed all claims over which it has original jurisdiction.") (quotation marks and ellipsis omitted).

## V.   CONCLUSION

For the reasons stated above, the Court grants in part and denies in part Defendants' motion for judgment on the pleadings.   The federal constitutional claims are dismissed with prejudice and the state law tort claims for assault, battery, and false imprisonment are dismissed without prejudice.

SO ORDERED.


|  | s:\Mark A. Goldsmith |
| Dated: September 24, 2014. | MARK A. GOLDSMITH |
| Detroit, Michigan | UNITED STATES DISTRICT JUDGE |

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on September 24, 2014.

s/Johnetta M. Curry-Williams
JOHNETTA M. CURRY-WILLIAMS
CASE MANAGER